UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHARLES DUFF,

Plaintiff,

vs. Case No.8:09-CIV-374-T-33TGW

PRISON HEALTH SERVICES, et al.,

Defendants.
_____________________________________________/

**O R D E R**

This cause is before the Court on the Medical Defendants (Prison Health Services, Inc.; Karen Riley, R.N.; Arron Scoggins, P.A.; and Jean Augustin, M.D.)'s motion for summary judgment (Doc. 100) and Plaintiff Duff's response in opposition to the motion for summary judgment. (Doc. 102).

Because the "record taken as a whole could not lead a rational trier of fact to find for Duff, there is no genuine issue for trial," *Matshshita Electrical Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 587 (1986), *quoted in Ricco v. DeStefano*, ___ U.S. ___, 129 S.Ct. 2658, 2677-78 (2009), and the Medical Defendants' motion for summary judgment will be **granted**.

## BACKGROUND

### The Complaint

Plaintiff Duff, who has not been incarcerated since March 1, 2011, is proceeding on his amended complaint. (Doc. 28 and Doc. 29 [Notice of Mitigating Factors by Charles Duff]) in which he contends:

Beginning in October 2006, Duff was incarcerated at Manatee County Jail. (MJC).

(Doc. 29, Doc. 28 at p. 17). Duff was suffering from ongoing urinary problems. (Id.) In November 2006, urination became difficult and painful for Duff, and he wrote a request to the medical department advising them of this situation, with no response. (Doc. 28 at p. 18).

In February 2007, Duff collapsed, due to urinary retention. (Doc. 28 at p. 19). He was "carried" to the medical department. (*Id.*). At that time, Duff received an emergency catheterization and was housed in the jail's infirmary. (*Id.*). The day after the procedure, Duff was taken to Manatee Memorial Hospital for a series of diagnostic tests, including a CT and an ultrasound. (Doc. 28 at p. 21). The ultrasound revealed two large cysts in the scrotum which needed to be removed. An enlarged prostate was suspected at that time. (*Id.*).

Between his hospital visit in February 2007 and March 31, 2007, Duff was taken several times to an outside urologist, Dr. Bilik, who performed additional diagnostics, including a cystoscopy and colonoscopy. (Doc. 28 at pp. 22-23). Dr. Bilik advised Duff that he had an enlarged prostate and required a surgical procedure call a "Laser TURP (Transurethral Resection of the Prostate.) (Doc. 28 at p. 24). Dr. Bilik prescribed Proscar and Flomax. (*Id.*).

Throughout this period, Duff was catheterized. (Doc. 28 at p. 25). On April 9, 2007, Duff went to court for sentencing, "with catheter bag in tow," and was sentenced to five years incarceration in the Florida Department of Corrections. (*Id.*). On April 10, 2007, Duff went to Dr. Bilik's office but the procedure that was planned could not be performed because the medical staff at the jail had failed to remove the catheter as directed. (*Id.*). He was told the decision regarding surgery had to be made between the doctor, the county

and Prison Health Services (PHS). (Doc. 28 at p. 26). It was intimated that providing surgery might be too expensive. (*Id.*).

On or about April 11, 2007, the catheter was removed. Duff was returned to the general population at the jail and was told, "You're DOC's problem now." (Doc. 28 at p. 32). On May 27, 2007, Duff was transported to a DOC facility, "with no surgery, and the medication that he had been receiving was discontinued." Subsequently, while in the DOC, Duff received TURP surgery.

Duff claims that by not placing him on a "Medical Hold," so that surgery could be performed more quickly, Defendants were deliberately indifferent to Duff's serious medical needs and violated Duff's rights under the Eighth and Fourteenth Amendments. (Doc. 28 at pp. 14-15). He claims that he has endured pain and suffering and has become sexually dysfunctional. (Doc. 28 at p. 30).

Duff seeks $450,000 in compensatory damages and $450,000 in punitive damages. (Doc. 28 at pp. 35-36).

**The Defendants' Affidavits**

**Affidavit of Jean Augustine, M.D. (Exhibit A to Motion for Summary Judgment)**

Dr. Augustine was formerly employed by PHS to provide care to inmates incarcerated in MCJ. (A-1). Duff was one of the inmates he saw at MCJ. (*Id.*).

Duff was received at MCJ on October 12, 2006. (A-2). He was very intoxicated and reported smoking cocaine continuously that day and that he had not slept or eaten for seven days. The nurse noted that it was difficult to get an accurate history in light of Duff's condition. He was admitted to the infirmary for observation for potential adverse effects of detoxification. (*Id.*).

Duff was seen in the infirmary on October 13, 2006. (A-3). He reported occasional alcohol and cocaine use, but was stable at this time. He also complained of back pain and was prescribed Motrin. (*Id.*).

Duff submitted inmate request forms on October 16, 17, 30 and November 2, 2006, for complaints regarding discharge from his penis and in the latter request forms of difficulty with urination. (A-4). He thought he might be suffering from a sexually transmitted disease. (*Id.*). On October 31, 2006, an order was issued for Duff to be tested for Chlamydia. (A-5).

Duff was seen on November 3, 2006, by Rebecca Bachelder, P.A. (A-6). He complained of purulent penile drip and urethral burning and low back "kidney" pain and fever. He was noted to be alert and oriented times three and in no acute distress. His vital signs were stable and he was afebrile. He was prescribed the following antibiotics: one dose of Cipro (Ciprofloxycin) 500 mg. po (by mouth), Doxycycline 100 mg. po bid (twice daily), and TAO topical cream to the affected area bid for seven days. He was prescribed Tylenol bid for seven days. Urinalysis samples were taken on this date. (*Id.*).

Laboratory tests results were reported on November 7, 2006. (A-7). They were negative for Chlamydia and positive for gonorrhea. On November 8, 2006, another single dose of Cipro 500 was ordered. This treatment proved effective as no additional complaints were noted until March 4, 2007, and those complaints were caused by a different underlying condition. (*Id.*).

On March 4, 2007, Duff was seen by the nursing staff for a complaint of being unable to void all day. (A-8). The nurse spoke with PA Scoggins and received an order for Duff to be catheterized. Duff initially reported pain with the insertion of the catheter but this resolved. Eight hundred and seventy five milliliters of clear urine was obtained and Duff

reported this made him feel much better. He was returned to the pod to be seen in follow-up with the PA the next day. (*Id.*).

On March 5, 2007, Dr. Augustin issued orders for Duff to be sent to the emergency room at Manatee Memorial Hospital for his complaint of continuing urinary retention. (A-9). Reports from Manatee Memorial Hospital note that Duff was seen on the morning of March 5, 2006, for a complaint of urinary retention. (A-10). He reported urinary retention that had started the previous night. He reported being catheterized at the jail with the collection of 800 milliliters of urine. Duff complained of mild testicular pain and a history of testicular lymphoma that was diagnosed in 2003, but was not followed. Duff had no fever, chills, flank pain, hematuria (blood in urine), or abdominal pain. The emergency room doctor's assessment was urinary retention, Epididymitis (Epidydimal cyst) and urinary tract infection. Duff was prescribed Cipro 500 mg 1 tablet every 12 hours for 10 days with no refills. He was to be followed at East Manatee Family Healthcare or by the doctor at the jail. (*Id.*).

After Duff was returned from the emergency room on March 5, 2007, he was placed in the infirmary. (A-11). His catheter was continued. Dr. Augustin issued orders for the Cipro for ten days, and he ordered that he be notified and Duff be given Tylenol if Duff's temperature rose above 100 degrees. Dr. Augustin ordered Duff's vital signs be monitored. (*Id.*).

Dr. Augustin examined Duff on March 6, 2007. (A-12). He reviewed the finding of the tests performed at Manatee Memorial Hospital, which included the report of a large epidydimal cyst with urinary retention. Dr. Augustin ordered that Duff receive a urological consult and that his intake and output be strictly monitored. Dr. Augustin ordered that a repeat CT of the abdomen be performed in 3 months. This was for potential conditions

shown on the CT at Manatee Memorial Hospital that were unrelated to Duff's urinary tract complaints. (*Id.*).

Dr. Augustin monitored Duff's progress in the infirmary on March 7, 9, 12 and 13, 2007. (A-13). Dr. Augustin noted that Duff expressed improvement over this period of time. On March 12, 2007, Dr. Augustin noted that Duff reported decreased pain and swelling in the testicle and decreased sympathetic tenderness. Dr. Augustin noted him to be clinically stable. On March 13, 2007, Dr. Augustin noted Duff reported improving symptoms. Dr. Augustin's assessment was that Duff was clinically improved. His plan was for Duff to continue with the present care, including catheterization. Dr. Augustin also noted Duff was to be seen by an outside urologist for follow-up. (*Id.*).

Dr. Augustin requested that Duff be seen by a urologist. (A-14). On March 14, 2007, Duff was seen by Dr. Bilik. Dr. Bilik's impression was BPH (Benign Prostate Hyperplasia). This condition is a swelling of the prostate. It can cause urinary insufficiency and retention. Dr. Bilik prescribed Proscar 5 mg po daily, Flomax .4 mg po daily, complete Cipro 500 mg bid for 14 days, leave Foley catheter in and to return for cystoscopy. (*Id.*).

After his visit with Dr. Bilik, Duff was returned to the infirmary. (A-15). Duff was seen by Dr. William Schmitt on March 20, 2007. Dr. Schmitt noted no significant findings. He ordered continuation of the current care plan. (*Id.*).

Dr. Augustin saw Duff on March 26, 2007. (A-16). Dr. Augustin noted mild sympathetic tenderness but no testicular swelling. He noted Duff was scheduled for cystoscopy the next day and he should not eat or drink after midnight on March 27, 2007. (*Id.*).

Dr. Augustin requested approval for Dr. Bilik to perform the cystoscopy. (A-17). This

request was approved and Dr. Bilik performed the procedure on March 28, 2007. His findings were reported as follows: mild bipolar BPH; no tumor, stone or sign of bladder decompensation. Dr. Bilik recommended discontinuing Proscar and increasing Flomax to .8 milligrams po daily. He recommended follow-up in one week with removal of the catheter on the morning of followup appointment. If Duff did not void when the catheter was removed, Dr. Bilik recommended "KTP Laser Vaporization." This is a procedure to reduce the size of the prostate. (*Id.*).

Dr. Augustin saw Duff on March 28, 2007, after he returned from the cystoscopy. (A-18). Dr. Augustin noted that Duff was status post cystoscopy with a diagnosis of mild bipolar BPH. He noted Duff would be given Keflex, a prophylactic antibiotic given to avoid infections that can result from the procedure. Dr. Augustin also noted Dr. Bilik's recommendations to maintain Duff on the Foley catheter, discontinue Proscar and increase Flomax. (*Id.*).

Dr. Augustin saw Duff on March 29 and 30 and on April 2 and 4, 2007. (A-19). Duff continued to improve. On March 30, 2007, Dr. Augustin noted that Duff feels "much better today". He also noted that Duff's catheter had mistakenly been dislodged but was immediately replaced. Dr. Augustin's examination of Duff physically on each of these visits was unremarkable. On each occasion, Dr. Augustin continued his current care plan. (*Id.*).

Duff was seen by Dr. Bilik on April 6, 2007, for follow up. (A-20). Dr. Bilik's report noted his assessment to be BPH with urinary retention. His recommendation was to continue medications and remove the Foley Catheter the next Tuesday. If Duff failed to void after the removal of the catheter, Dr. Bilik directed it be replaced and his office be notified. On March 28, 2007, Dr. Bilik requested that Duff's catheter be removed on the morning of

the next followup visit. Dr. Augustin entered an order on April 9, 2007 to remove the catheter in the morning of April 10, 2007. Dr. Augustin thought Duff's follow up visit was scheduled for April 10, 2007. Dr. Augustin was mistaken as Duff saw Dr. Bilik on April 6, 2007. Since the catheter was not removed before the April 6, 2007 visit, Dr. Bilik requested it be removed the following week at the jail and for Duff to be observed and for Dr. Bilik's other recommendations to be followed. (*Id.*).

Dr. Augustin ordered Duff's catheter to be removed and it was removed on April 11, 2007 at 8:30 a.m. (A-21). A nursing note for 2:00 p.m. noted that Duff reported voiding since the removal of the catheter, but that the flow was slow. (*Id.*).

Dr. Augustin noted on April 11, 2007, that the catheter had been removed. (A-22). He noted that Duff's intake and output should be monitored and if Duff had further difficulty voiding that the catheter should be reinserted and Dr. Bilik's office notified. (*Id.*).

A nursing note for April 12, 2007, noted Duff was voiding, but slowly. (A-23). Dr. Augustin saw Duff on April 12, 2007. Duff reported no new complaints. He reported no abdominal or testicular pain. He reported that he was urinating appropriately. Dr. Augustin's physical examination of Duff was normal and unremarkable. Dr. Augustin noted he was voiding well, was clinically stable and he could be transferred back to the general population. Dr. Augustin continued the Flomax and noted that Duff would be seen as needed for follow up. (*Id.*).

On April 27, 2007, Duff was seen by P.A. Scoggins for follow up of the urinary retention issue. (A-24). Duff reported that he was doing well and was able to full empty his bladder but he sometimes needed to do this sitting down. Duff also reported waking four to five times at night but that he was drinking coffee. P.A. Scoggins ordered the

continuation of the prescription of Flomax at .8 mg a day. (*Id.*).

Duff’s prescription for Flomax, and at the dosage recommended by Dr. Bilik, was continued at all times while Duff was incarcerated at MCJ. (A-25). A review of the MAR (medication administration record) indicates Duff received Flomax on every day in April, except possibly on April 9, 2007. He was prescribed Flomax for every day in May 2007. He only received it on May 1, 2007. He was transferred "around this time," which would explain Duff's only receiving Flomax on May 1, 2007. (*Id.*).

Duff never reported any signs or symptoms which would suggest the need of medical treatment for his urinary conditions that was not provided. (A-26). Instead, he received treatment that was appropriate and according to acceptable medical standards. Duff’s sexually transmitted disease was diagnosed and effectively treated with standard protocols. His urinary retention was not related to the sexually transmitted disease. The urinary retention was promptly addressed and Duff was sent to the emergency room in less than twenty-four hours of presentation and after his receiving appropriate treatment by catheterization at the jail. After being seen at the hospital, Duff was kept in the infirmary where he was vigilantly monitored. He was sent to an outside urological specialist and the recommendations of the urologist were followed. The only recommendation of Dr. Bilik that was not performed was that Duff’s catheter was not removed on the day of his April 6, 2007 visit. Dr. Augustin acknowledges this error but it was not in any way caused by his desire not to follow Dr. Bilik's recommendations. Dr. Augustin was responsible for getting Duff to Dr. Bilik and he followed every recommendation he made. (*Id.*).

Moreover, Duff suffered no damage or injury as a result of the care and treatment he received for his urinary condition, including the mistake in not removing the catheter on

April 6, 2007. (A-26). Dr. Augustin and the medical staff followed Dr. Bilik's recommendation to remove the catheter the next week and to monitor Duff's progress. Duff adequately voided after the catheter was removed. No custom, practice, policy or procedure of PHS or MCJ caused Dr. Augustin or the other health care providers to do something that was not appropriate and according to acceptable medical standard or to refrain to do something that was medically required. (*Id.*).

**Affidavit of Aaron Scoggins, P.A.**
**(Exhibit B to Defendants' Motion for Summary Judgment)**

Physician's Assistant (P.A.) Scoggins is employed by Corizon Health, Inc., formerly PHS. (B-1). He provided care to inmates incarcerated in MCJ, including Duff. (*Id.*).

On March 4, 2007, Duff was seen by the nursing staff for a complaint of being unable to void all day. (B-2). The nurse called P.A. Scoggins and he ordered that Duff be catheterized. P.A. Scoggins was not directly involved with this event other than receiving the history and findings of the nurse and issuing this order. This is standard protocol. If Duff's condition worsened and that had been reported by the nursing staff, P.A. Scoggins would have asked them to consult with Dr. Augustin or transfer Duff to the emergency room. The catheter removed 875 milliliters of clear urine and Duff reported this made him feel much better. This allowed him to be returned to the pod to be seen by P.A. Scoggins the next day. However, Duff continued to retain urine overnight and Dr. Augustin ordered that he be transferred to the emergency room. (*Id.*).

After March 4, 2007, Duff's care for urinary retention was directed by Dr. Augustin in consultation with Dr. Bilik, the consulting urologist. P.A. Scoggins' only other involvement with Duff on this issue was on April 27, 2007, when P.A. Scoggins saw Duff in follow-up

after the removal of his catheter. On this occasion, Duff reported that he was doing well and was able to fully empty his bladder but he sometimes needed to do this sitting down. Duff also reported waking four to five times at night, but he acknowledged drinking coffee. P.A. Scoggins ordered the continuation of the prescription of Flomax at .8 mg a day. (*Id.*).

The actions of P.A. Scoggins were totally appropriate. He did not ignore any condition of which he was aware and to the limited extent that he prescribed treatment, those treatments were appropriate. (B-4). Ordering catheterization was appropriate and returning Duff to the pod was appropriate given the response Duff had to the catheter. The only other treatment P.A. Scoggins prescribed was to continue the prescription for Flomax, which had been ordered by Dr. Augustin and was appropriate. No custom, practice, policy or procedure of PHS or MCJ caused P.A. Scoggins to do something that was not appropriate and according to acceptable medical standards or to refrain to do something that was medically required. (*Id.*).

**Affidavit of Paula Mangarella**
**(Exhibit C to Defendants' Motion for Summary Judgment)**

Paula Mangarella is a Regional Manager at MCJ. (C-1). Attached as Exhibit 1 to Ms. Mangarella's Affidavit are true and accurate copies of the medical records from MCJ pertaining to Duff's care and treatment as it relates to the allegations in his Complaint. (C-2). Ms. Mangarella is familiar with and has reviewed the PHS employment records of Karen Riley, R.N., a named defendant in this lawsuit. (C-3). Karen Riley, a Health Services Administrator at MCJ, did not work at MCJ at any time from the beginning of October 2006 through the end of May 2007. (C-3). She was first employed on May 19, 2010. Her last day of work at MCJ jail was October 4, 2010. (*Id.*).

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. In 1986, the Supreme Court decided a trio of cases which encourage the use of summary judgment as a means to dispose of cases which are not factually or legally supported. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp.*, 477 U.S. 317; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

The primary purpose of granting summary judgment is to avoid unnecessary trials when there is no genuine issue of material fact in dispute, so if the evidence opposing summary judgment is merely colorable or is not significantly probative, summary judgment should be granted. *See Anderson,* 477 U.S. at 249-50. Furthermore, once a moving party identifies those portions of the record showing the absence of a genuine issue of material fact, the party opposing summary judgment must set forth specific facts showing a genuine issue for trial and may not rely on mere allegations or denials. *See Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256-57. If the record as a whole could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue of fact precluding summary judgment. *See Matsushita*, 475 U.S. at 586. Where the record facts render the non-moving party's claim implausible, it must come up with more persuasive evidence than would otherwise be necessary to defeat summary judgment. *Id.* At 587. In this case, there is no issue of disputed fact and the record evidence entitles Medical Defendants to entry of summary judgment in their favor as a matter of law.

## DISCUSSION

### Title 42 U.S.C. 1983 and the Eighth Amendment

Title 42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n. 3 (1979). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 is a mechanism for bringing claims for federal constitutional or statutory violations.

Duff was a pretrial detainee during the time period relevant to his Complaint. Therefore, the claim is properly one for violation of the Fourteenth Amendment's Due Process Clause. Nevertheless, the claim is properly considered according to the same standard: deliberate indifference. *See Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir.1994); *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir.1985) (holding that "in regard to providing pretrial detainees with such basic necessities as . . . medical care[,] the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons").

**Deliberate Indifference**

To maintain his constitutional claim, Duff must demonstrate that he suffered an objectively serious health deprivation, and the Medical Defendants were deliberately indifferent to his medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976). Additionally, there must be a showing that the acts of the Medical Defendants were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833-38 (1994); *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1191 n.28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law). In *Farmer v. Brennan,* 511 U.S. 825 (1994), the Supreme Court defined the mental state required for "deliberate indifference," as follows:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; <u>the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference</u>.... But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Id.* at 837-38 (internal citation omitted) (emphasis added).

The deliberate indifference standard is a demanding one, and a showing of negligence is never enough, as the Supreme Court has stated that "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment. . . ." *Estelle* 429 U.S. at 104, 106; *see Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995). In *Estelle,* the court reinstated the district court's dismissal of a prisoner's section 1983 complaint for failure to state a claim.

Recognizing that the plaintiff s primary claim was that "more should have been done" to diagnose and treat a back injury, the Court explained, "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." *Id.* at 107; see *McElligott v. Foley*, 182 F.3d 1248, 1256 (11th Cir. 1999) (holding that failure to diagnose an inmate's colon cancer did not constitute deliberate indifference, even though it could be deemed extremely negligent).

Additionally, because the Constitution is not a vehicle for bringing medical malpractice claims or a substitute for state tort law, not every lapse in jail medical care will rise to the level of a constitutional violation. *See Estelle* at 105-06. Since society does not expect that prisoners will have unqualified access to health care, a prisoner must first make the threshold showing of serious illness or injury in order to state a constitutional claim for denial of medical care. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

From the foregoing, a general rule emerges. To continue a constitutional claim, Plaintiff must show: (1) a substantial risk of serious harm and resultant serious injury; (2) Defendants' subjective knowledge of that risk; (3) the intentional or reckless refusal to treat the serious medical need; and (4) causation. *See Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir.1995). The record in this case fully supports the grant of summary judgment to the Medical Defendants because Duff was not treated with deliberate indifference.

Where it is shown that an inmate has received significant medical attention for his complaints and has not been ignored, the federal courts are reluctant to second guess the medical judgments of those providing care. *Hamm v. Dekalb County,* 774 F.2d 1567, 1575 (11th Cir. 1985). A plaintiff does not state a cognizable claim where he simply seeks to substitute his judgment as to medical matters for that of the medical staff. *See Estelle* at

107.

There is no evidence that the Medical Defendants were deliberately indifferent to Duff's serious medical needs or acted recklessly. Instead, the evidence shows that Duff received significant attention and appropriate care by the Medical Defendants at MCJ.

When Duff was received at MCJ in October 2006, Duff's sexually transmitted disease was diagnosed and effectively treated with standard protocols. Duff's urinary retention was promptly addressed as Duff was sent to the emergency room in less than twenty-four hours of presentation and he received appropriate treatment by catheterization at the jail. After being seen at the hospital, Duff was kept in the infirmary where he was vigilantly monitored. Duff was sent to an outside urological specialist and the recommendations of the urologist were followed. The only recommendation of Dr. Bilik that was not performed was that Duff's catheter was not removed on the day of his April 6, 2007 visit, since Dr. Augustin thought the follow up visit was scheduled for April 10, 2007, not April 6, 2007. Dr. Augustin acknowledges this error but it was not in any way caused by his desire to not follow the recommendations, and the catheter was removed on the next visit. Dr. Augustin was responsible for getting Duff to Dr. Bilik and he followed every other recommendation Dr. Bilik made.

Moreover, Duff suffered no damage or injury as a result of the care and treatment he received for his urinary condition, including the mistake in not removing the catheter on April 6, 2007. Dr. Augustin and the medical staff followed Dr. Bilik's recommendation to remove the catheter the next week and to monitor Duff's progress. Duff adequately voided after the catheter was removed. There is no evidence that Dr. Augustin or the other health care providers acted with deliberate indifference. Instead, Duff was closely followed, given

the appropriate medications, referred to an outside urologist and was otherwise properly treated.

The actions of P.A. Scoggins also do not constitute deliberate indifference. Ordering catheterization was appropriate and returning Duff to the pod was appropriate given the response Duff had to the catheter. The only other treatment P.A. Scoggins prescribed was to continue the prescription for Flomax, which had been ordered by Dr. Augustin and was appropriate. Karen Riley, R.N. did not work at MCJ Jail at any time from the beginning of October 2006 through the end of May 2007, and thus, she never treated or saw Duff. She was first employed at MCJ on May 19, 2010.

Therefore, in light of the treatment received by Duff, there is no evidence to establish that any of the Medical Defendants acted with neglect. Instead, the evidence shows that the care Duff received was attentive and appropriate. Duff's claim that he should have been placed on “Medical Hold” so surgery could have been performed sooner fails under *Estelle* as he is attempting to substitute his judgment for that of his medical providers. This contention alleges only a claim of medical negligence. However, even if negligence was a viable theory, which it is not, Duff cannot show neglect, as illustrated above. Duff's contention is barred by the principles set out in *Estelle*.

No custom, practice, policy or procedure of PHS or MCJ caused the Medical Defendant to do something that was not appropriate and according to acceptable medical standard or to refrain to do something that was medically required. This is a classic case of a Plaintiff attempting to substitute his opinions as to the proper care for that of the licensed professionals providing care to him. Duff's complaints were not ignored by Medical Defendants. To the contrary, Duff was seen on multiple occasions and Medical Defendants

made medical judgments, which were reasonable under the circumstances in light of Duff's presentation. In summary, Duff received appropriate care from Medical Defendants; he sustained no damages or injuries as a result of their actions; and he cannot substitute his opinions for that of the Medical Defendants.

**DUFF'S ALLEGATIONS IN HIS RESPONSE**

Duff contends that the Defendants should have submitted the affidavits of Dr. Bilik and Dr. Miguel (who performed the transurethral Resection of the Prostate) as they would have proven Duff needed the prostate surgery as soon as possible. Duff could have secured these affidavits, since he is not incarcerated. Duff must come forward with affirmative evidence to support his claim. *Anderson,* 477 U.S. at 257. It is not the responsibility of the Medical Defendants to submit these affidavits.

Duff also complains that Medical Defendants did not respond to a subpoena served by United States Mail on July 6, 2010. He alleges that they were in defiance of the federal subpoena and have withheld crucial evidence. Unfortunately for Duff, Defendants were not required to respond to a subpoena served by regular mail.

As stated in *Florida Media, Inc. v. World Publications, LLL,* 236 F.R.D. 693 (M.D. Fla. 2006):

> Service of a subpoena upon the person named is made by "delivering a copy thereof to such person." Fed.R.Civ.P. 45(b)(1). There is a split among the circuits whether "delivery" of the subpoena requires personal delivery. *See, e.g., FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, 1312-13 (D.C. Cir.1980) (holding that rule does not permit any form of mail service and that compulsory process may be served upon an unwilling witness only in person); *Firefighter's Institute for Racial Equality ex rel. Anderson v. City of St. Louis*, 220 F.3d 898, 903 (8th Cir.2000) (interpreting Rule 45(b)(1) to allow service by other than personal delivery if it is a method that ensures the subpoena is placed in the actual possession or control of the person served). The Eleventh Circuit has not yet ruled on this issue. Service

> by regular mail, however, is almost always rejected as an effective means of serving subpoenas and courts will quash a subpoena on that basis alone. *See, City of St. Louis*, 220 F.3d at 903.

236 F.R.D. at 695.

Accordingly, the Court orders:

That Defendants' motion for summary judgment (Doc. 100) is granted. The Clerk is directed to terminate any pending motions, to enter judgment for the Medical Defendants, and to close this case.

ORDERED at Tampa, Florida, on September 26, 2011.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Counsel of Record
Charles Duff